**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

**No. 18-15982**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION

CARLO LICATA, ADAM PEZEN, AND NIMESH PATEL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees*,

*v.*

FACEBOOK, INC.,
*Defendant-Appellant.*

On Petition for Permission to Appeal from the
United States District Court for the Northern District of California
Honorable James Donato
Case No. 3:15-cv-03747-JD

## APPELLANT'S BRIEF


Lauren R. Goldman
Andrew J. Pincus
Michael Rayfield
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020

*Counsel for Appellant*

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, appellant Facebook, Inc. states that it is a publicly held non-governmental corporation, that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS


Introduction ....................................................................................1

Jurisdictional Statement ...............................................................5

Issues Presented For Review.........................................................5

Statement Of The Case ..................................................................6

- A. The Illinois Biometric Information Privacy Act ........................6
- B. Facebook's Tag Suggestions Feature.........................................8
- C. Facebook's Disclosures About Tag Suggestions.......................10
- D. Plaintiffs' Complaint...............................................................11
- E. Facebook's Motions to Dismiss ...............................................11
- F. Class Certification and Facebook's Rule 23(f) Appeal............15

Standard Of Review .....................................................................16

Summary Of Argument.................................................................17

Argument .....................................................................................20

I. Plaintiffs Have Failed To Establish That They Have Article III Standing ........................................................................................20

- A. Plaintiffs Have Not Invoked a BIPA Provision that Protects Concrete Interests........................................................22
- B. Plaintiffs Have Suffered No Real-World Harm .......................26
  - 1. Plaintiffs Have Disclaimed Any Actual Harm .............27
  - 2. Alleging a "Privacy Violation" Is Insufficient................30
  - 3. Facebook Disclosed the Relevant Conduct ....................31

II. Common Issues Do Not Predominate Because Each Class Member's Ability To Invoke BIPA Depends On Inherently Individualized Questions ..............................................................33

- A. Illinois' Extraterritoriality Rule Defeats Predominance.........34
  - 1. The District Court Erred in Holding that a Plaintiff's "Location" in Illinois Is Sufficient to Establish a Domestic Application of BIPA ....................35

2. An Individualized, Multi-Factor Analysis Is Necessary for Each Class Member ..... 39

B. The "Aggrieved" Requirement in BIPA's Private Right Of Action Defeats Predominance ..... 45

1. BIPA Requires a Showing of Actual Injury Beyond a Violation of the Notice-And-Consent Provisions ..... 46

2. Proof of Actual Injury Will Be Individualized, Precluding a Finding of Predominance ..... 48

C. Class Certification Is Improper Because Most Class Members Lack Article III Standing ..... 53

III. A Class Action Is Not Superior To Individual Actions: The Class-Wide Aggregation Of BIPA's Statutory Damages Award Would Be Contrary To The Legislative Intent And Federal Due Process ..... 54

A. A Class Cannot Be Certified if it Creates the Potential for a Massive and Disproportionate Statutory Award that Would Be Inconsistent with Legislative Intent ..... 54

B. The General Assembly Did Not Intend to Permit an Enormous Class-Wide Award in this Situation ..... 57

C. The District Court's Reasoning Was Erroneous ..... 60

Conclusion ..... 61

## TABLE OF AUTHORITIES

**Cases**

*Aguilar v. Rexnord, LLC*,
2018 WL 3239715 (N.D. Ill. July 3, 2018) ..... 22

*Aiello v. Providian Fin. Corp.*,
239 F.3d 876 (7th Cir. 2001) ..... 51

*Avery v. State Farm Mut. Auto. Ins. Co.*,
216 Ill. 2d 100 (2005) ..... 35, 36, 37, 39, 40

*Bassett v. ABM Parking Servs, Inc.*,
883 F.3d 776 (9th Cir. 2018) ..... 22, 25, 26, 56

*Bateman v. Am. Multi-Cinema, Inc.*,
623 F.3d 708 (9th Cir. 2010) ..... 56

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
242 F.3d 290 (5th Cir. 2001) ..... 17

*Braitberg v. Charter Commc'ns, Inc.*,
836 F.3d 925 (8th Cir. 2016) ..... 26

*Bruce v. Teleflora, LLC*,
2013 WL 6709939 (C.D. Cal. Dec. 18, 2013) ..... 51

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) ..... 2

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*,
867 F.3d 1093 (9th Cir. 2017) ..... 17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ..... 4, 33, 48

*Cooper Indus., Inc. v. Leatherman Tool Grp.*,
532 U.S. 424 (2001) ..... 57

*Cruz v. Lawson Software, Inc.*,
2010 WL 890038 (D. Minn. Jan. 5, 2010) ..... 40

*Davis v. Nationstar Mortg., LLC*,
2016 WL 6822017 (N.D. Cal. Nov. 18, 2016) .......................................... 49

*De Stefan v. Frito-Lay, Inc.*,
2011 WL 13176229 (C.D. Cal. June 6, 2011) .......................................... 51

*Dixon v. Wash. & Jane Smith Cmty.*,
2018 WL 2445292 (N.D. Ill. May 31, 2018) .............................................. 25

*Doe v. Chao*,
540 U.S. 614 (2004) .................................................................................. 59

*Dutta v. State Farm Mut. Auto. Ins. Co.*,
895 F.3d 1166 (9th Cir. 2018) ............................................... 26, 27, 28, 29

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ...................................................................... 26

*Fraley v. Batman*,
638 F. App'x 594 (9th Cir. 2016) ................................................................ 56

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
528 U.S. 167 (2000) .................................................................................. 20

*Goings v. UGN, Inc.*,
2018 WL 2966970 (N.D. Ill. June 13, 2018) ...................................... 22, 31

*Graham v. Gen. U.S. Grant Post No. 2665, V.F.W.*,
43 Ill. 2d 1 (1969) ........................................................... 35, 36, 37, 39, 41

*Gubala v. Time Warner Cable, Inc.*,
846 F.3d 909 (7th Cir. 2017) ...................................................................... 26

*Gulec v. Boeing Co.*,
698 F. App'x 372 (9th Cir. 2017) ................................................................ 50

*Hackett v. BMW of N. Am., LLC*,
2011 WL 2647991 (N.D. Ill. June 30, 2011) ............................................. 38

*Haught v. Motorola Mobility, Inc.*,
2012 WL 3643831 (N.D. Ill. Aug. 23, 2012) ............................................. 40

*In re Horizon Healthcare Servs., Inc. Data Breach Litig.*,
846 F.3d 625 (3d Cir. 2017)....................................................................26

*Howe v. Speedway LLC*,
2018 WL 2445541 (N.D. Ill. May 31, 2018)......................... 23, 24, 30, 41

*Jones v. Takaki*,
38 F.3d 321 (7th Cir. 1994) ....................................................................40

*Kline v. Coldwell, Banker & Co.*,
508 F.2d 226 (9th Cir. 1974) ..............................................................55, 56

*Landau v. CNA Fin. Corp.*,
381 Ill. App. 3d 61 (2008) ...........................................................4, 36, 38

*Lee v. Verizon Commc'ns*,
837 F.3d 523 (5th Cir. 2016) ....................................................................29

*London v. Wal-Mart Stores, Inc.*,
340 F.3d 1246 (11th Cir. 2003) ................................................................55

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......................................................................20, 21, 30

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ....................................................................53

*McCollough v. Smarte Carte, Inc.*,
2016 WL 4077108 (N.D. Ill. Aug. 1, 2016) .......................... 23, 24, 41, 59

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008)......................................................................51

*Meyers v. Nicolet Rest. of De Pere, LLC*,
843 F.3d 724 (7th Cir. 2016) ................................................. 22, 27, 29, 33

*Miller UK Ltd. v. Caterpillar Inc.*,
2017 WL 1196963 (N.D. Ill. Mar. 31, 2017)...........................................39

*Monroy v. Shutterfly, Inc.*,
2017 WL 4099846 (N.D. Ill. Sept. 15, 2017) .....................................42, 59

*Murray v. Fin. Visions, Inc.*,
2008 WL 4850328 (D. Ariz. Nov. 7, 2008)............................................53

*Nayab v. Capital One Bank, N.A.*,
2017 WL 2721982 (S.D. Cal. June 23, 2017) ........................................30

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001)....................................................................51

*Nicklaw v. CitiMortgage, Inc.*,
839 F.3d 998 (11th Cir. 2016) ................................................................29

*Parker v. Time Warner Entm't Co.*,
331 F.3d 13 (2d Cir. 2003)......................................................................55

*Potomac Leasing Co. v. Chuck's Pub, Inc.*,
156 Ill. App. 3d 755 (1987) ....................................................................34

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ................................................................51

*Ratner v. Chem. Bank N.Y. Tr. Co.*,
54 F.R.D. 412 (S.D.N.Y. 1972) ..............................................................55

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017).....................................................42

*Robins v. Spokeo, Inc.*,
867 F.3d 1108 (9th Cir. 2017) ........................................ 21, 23, 26, 27, 29

*Rosenbach v. Six Flags Entm't Corp.*,
2017 IL App (2d) 170317........................................... 41, 45, 46, 47, 49, 53

*Sali v. Corona Reg'l Med. Ctr.*,
889 F.3d 623 (9th Cir. 2018) .............................................................17, 33

*Sekura v. Krishna Schaumburg Tan, Inc.*,
2018 IL App (1st) 180175....................................................... 47,48, 57, 59

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ...................................................................37, 55, 60

*Spade v. Select Comfort Corp.*,
232 N.J. 504 (2018) .......... 52

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) .......... 2, 21, 22, 27

*St. Louis, I.M. & S. Ry. Co. v. Williams*,
251 U.S. 63 (1919) .......... 5, 56, 57

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) .......... 50

*Sterk v. Redbox Automated Retail, LLC*,
672 F.3d 535 (7th Cir. 2012) .......... 59

*Stillmock v. Weis Mkts., Inc.*,
385 F. App'x 267 (4th Cir. 2010) .......... 55, 57

*Syed v. M-I, LLC*,
853 F.3d 492 (9th Cir. 2017) .......... 27

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) .......... 53

*Valley Air Servs. v. Southaire, Inc.*,
2009 WL 1033556 (N.D. Ill. Apr. 16, 2009) .......... 37, 38

*Vigil v. Take-Two Interactive Software, Inc.*,
235 F. Supp. 3d 499 (S.D.N.Y. 2017) .......... 23, 24, 58

*Vulcan Golf, LLC v. Google Inc.*,
552 F. Supp. 2d 752 (N.D. Ill. 2008) .......... 38

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) .......... 17

*In re Zappos.com, Inc.*,
888 F.3d 1020 (9th Cir. 2018) .......... 17

**Statutes**

740 ILCS 14/5 .......... 6, 7, 57, 548

740 ILCS 14/10 .......................................................................... 7, 58

740 ILCS 14/15 .......................................................................... 7, 247

740 ILCS 14/20 .......................................................................... 4, 7, 8, 45, 59

28 U.S.C. § 1292 .......................................................................... 5

28 U.S.C. § 1332 .......................................................................... 5

N.J.S.A. 56:12-15 .......................................................................... 51

N.J.S.A. 56:12-17 .......................................................................... 52

**Other Authorities**

2012 Cal. Leg. Serv. Ch. 733 § 1 (S.B. 1161) (Sept. 28, 2012) .......................... 35

Am. to Senate Bill 2400 § 10 (Apr. 11, 2008) .......................................... 58

Cal. Sen. Bill No. 169 (July 5, 2001) .......................................................... 35

Fed. R. Civ. P. 23 .......................................................................... 5, 54

MCLAUGHLIN ON CLASS ACTIONS § 5:23 (14th ed. 2017) .............................. 48

## INTRODUCTION

Facebook, Inc. offers a free social-networking service that allows people to connect and share content, including photographs, with their friends and family. An optional feature called "Tag Suggestions" makes it easier for people to search, organize, and share their photos. When a user uploads a photo, Facebook may use facial-recognition software to analyze whether the photo includes any of the user's Facebook friends—the people who have chosen to interact with the user on the service. If so, Facebook may suggest that the user "tag" the photo with the friend's name and a link to his account. If the user accepts the suggestion, the friend is ordinarily notified of the photo and granted access to it. Facebook's Data Policy, to which all users agree when they sign up for the service, explains how Tag Suggestions works and how to opt out of the feature. If a user opts out, Facebook deletes that user's face recognition "template."

The plaintiffs in this case allege that Tag Suggestions violates the Illinois Biometric Information Privacy Act ("BIPA"). BIPA was designed to regulate certain biometric technologies in connection with financial transactions and security screenings, and expressly excludes "information derived from" "photographs." Plaintiffs claim that when photos of them were uploaded to Facebook, Facebook analyzed those photos without

complying with BIPA's provisions requiring entities that collect "biometric identifiers" to provide specific kinds of notice and obtain written consent. Plaintiffs conceded below that they have suffered no harm from Tag Suggestions. Yet they seek billions of dollars in aggregated statutory damages on behalf of millions of Facebook users.

The district court certified a Rule 23(b)(3) class of "Facebook users located in Illinois for whom Facebook created and stored a face template after June 7, 2011." Facebook petitioned for leave to appeal under Rule 23(f), arguing that this decision implicated "fundamental issue[s] of law related to class actions" and rested on "manifest error." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 955 (9th Cir. 2005). This Court granted the petition and stayed the proceedings below pending the appeal. The Court should vacate the decision below for three reasons.

1. Plaintiffs lack Article III standing: They have failed to demonstrate the "real," "concrete injury" required by *Spokeo v. Robins*, 136 S. Ct. 1540 (2016), and this Court's precedents. Plaintiffs *testified* that they suffered no real harm from Tag Suggestions—monetary, emotional, reputational, or otherwise—and their counsel conceded that they "haven't found" that "any consequential harm resulted." That concession is unsurprising: Plaintiffs allege that Facebook analyzed their photos for the

purpose of suggesting tags to people they *chose* to connect with, and thus already knew what they looked like, using a feature that was disclosed to them, which they could have turned off at any time. Plaintiffs do not allege that Facebook shared their data with anyone, inadequately protected it from the risk of a breach, or used it for any purpose other than suggesting tags. Nor do plaintiffs allege that they would have done anything differently had they received the *forms* of disclosures that they believe BIPA requires rather than those Facebook actually provided.

2. Even if this case can proceed in federal court, it cannot proceed as a class action because common issues do not predominate. The district court determined that the case presented two common issues: whether Facebook's technology obtains a "biometric identifier" under BIPA, and whether Facebook complied with BIPA's notice-and-consent provisions. But a finding in plaintiffs' favor on both of those questions would not establish liability to anyone: No class member may recover without proving that he can invoke BIPA to begin with. Here, that analysis turns on two individualized and highly fact-specific questions, each of which independently defeats predominance.

First, to invoke BIPA, each class member must show that the "majority of circumstances related to" his particular claim occurred in

Illinois—an inherently individualized inquiry. *Landau v. CNA Fin. Corp.*, 381 Ill. App. 3d 61, 63-65 (2008). This showing is required by Illinois law whenever a plaintiff sues under a statute that, like BIPA, does not have express extraterritorial effect. The district court refused to apply this test—effectively giving BIPA *nationwide* effect.

Second, a private party cannot sue under BIPA unless he was "aggrieved by a violation of this Act." 740 ILCS 14/20. To satisfy this provision, each plaintiff must make an individualized showing of injury *beyond* the alleged BIPA violation. Some plaintiffs will not claim such an injury, and if others do, each will have to offer evidence of how exactly he was affected (*e.g.*, emotionally or monetarily) by the alleged collection of his biometric data. Because plaintiffs cannot prove injury with "evidence that [is] common to the class rather than individual to its members," there is no predominance. *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013).

3. Rule 23 and federal due process preclude the aggregate statutory damages award that plaintiffs seek. This Court and others have long disapproved of class actions that seek huge money judgments untethered to the degree of injury and inconsistent with legislative intent. Despite claiming *no* actual injury, plaintiffs seek a figure plainly calculated to extract a massive settlement from Facebook and chill the

development of useful technologies—not just in Illinois but around the world. This kind of class action cannot be squared with BIPA's text, structure, and legislative history—all of which reflect the legislature's policy decision to balance the risks of biometric technologies against their benefits by carefully cabining liability. Nor can it be squared with federal due process—which independently prohibits "severe," "oppressive," and "disproportion[ate]" statutory awards. *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919).

## JURISDICTIONAL STATEMENT[1]

The district court held that it had jurisdiction under 28 U.S.C. § 1332(d). This Court has jurisdiction to review the district court's order granting class certification under 28 U.S.C. § 1292(e) and Rule 23(f). The district court entered that order on April 16, 2018. ER1-15. Facebook timely filed a petition for leave to appeal on April 30, 2018. ER165-94. This Court granted the petition on May 29, 2018. ER48.

## ISSUES PRESENTED FOR REVIEW

1. Whether plaintiffs have established Article III standing despite their failure to allege or provide evidence of any real-world harm.

2. Whether Rule 23(b)(3)'s predominance requirement is satisfied

---

[1] "ER__" refers to Facebook's Excerpts of Record. "Dkt. __" refers to entries on the district court's docket that are not in the ER.

where each class member's ability to bring a claim depends on whether he can show that (a) the "majority of circumstances related to" his statutory claim occurred in Illinois; and (b) he was "aggrieved"—actually injured—"by a violation of" the statute.

3. Whether Rule 23(b)(3)'s superiority requirement and federal due process preclude certification of a no-injury class action seeking billions of dollars under BIPA.

## STATEMENT OF THE CASE

### A. The Illinois Biometric Information Privacy Act

BIPA was enacted in 2008 to regulate the use of biometric technologies "in the business and security screening sectors" in Illinois. 740 ILCS 14/5(a). The Illinois General Assembly found that "[t]he use of biometrics is growing in [these] sectors and appears to promise streamlined financial transactions and security screenings" (*id.*), "including finger-scan technologies at grocery stores, gas stations, and school cafeterias" (*id.* 14/5(b)). But because there is a "heightened risk for identity theft" when biometric data is "compromised" (*id.* 14/5(c)), "many members of the public [had been] deterred from partaking in biometric identifier facilitated transactions" (*id.* 14/5(e)). The legislature found that the public would "be served by regulating" this data under certain

circumstances. *Id.* 14/5(g).

BIPA covers six specified "biometric identifiers"—"a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry"—as well as "biometric information" derived from one of these identifiers and used to identify a person. *Id.* 14/10. The General Assembly expressly excluded other items, including "photographs" and "information derived from" photographs. *Id.*

Private entities that collect "biometric identifiers" or "biometric "information" must comply with five requirements: They must publish a written "schedule and guidelines" for the retention and destruction of the data. *Id.* 14/15(a). They must inform the subject "in writing" of the collection, the purpose, and the duration of storage, and obtain a "written release" before collecting the data. *Id.* 14/15(b). They may not "sell, lease, trade, or otherwise profit" from the data. *Id.* 14/15(c). They may not "disclose" or "disseminate" the data without consent. *Id.* 14/15(d). And they must take reasonable measures to "protect from disclosure" all regulated data. *Id.* 14/15(e). Plaintiffs invoke only the first two of these provisions. *See* p. 11 *infra*.

BIPA provides a limited "right of action" to "[a]ny person aggrieved by a violation of this Act." *Id.* 14/20. The statute further limits the

availability of damages, as distinct from injunctive relief and attorneys' fees: A plaintiff may recover "liquidated damages of $1,000 or actual damages, whichever is greater," but only if he proves that the defendant "negligently" violated BIPA; if the defendant "intentionally or recklessly" violated BIPA, the plaintiff may recover "liquidated damages of $5,000 or actual damages, whichever is greater." *Id.* 14/20(1)-(2).[2]

**B. Facebook's Tag Suggestions Feature**

Facebook allows people around the world to connect and share online material with each other. People connect primarily by adding other users as "friends": A user sends another user a "friend request," and if the request is accepted, the two people are able to share a wide variety of content, including photographs. For many years, Facebook has made the sharing of photos more personal and social by allowing people to "tag" friends in photos with their names and a link to their profiles. ER95. The people tagged are then notified (unless they have chosen not to receive such notifications), granted access to the photo, and allowed to share the photo with other friends or "un-tag" themselves if they choose.

In 2010, Facebook launched Tag Suggestions. *Id.* When a person

---

2 Illinois is the only state that has established a private right of action based on the collection of biometric data; Texas and Washington regulate such data, but their statutes do not have private rights of action.

uploads a photo, Facebook sometimes uses facial-recognition technology to analyze whether the user's Facebook friends are in the photo. ER2. The technology compares data derived from the photo with the stored "templates" of a subset of the user's Facebook friends. *Id.* If there is a match, the user has the option to tag those friends. *Id.*[3]

Users can opt out of this feature at any time. [redacted] ER195. If a user opts out, the template is deleted and the user's name will no longer be suggested if a friend uploads photos of him. ER58-59. Facebook never sells facial-recognition data or shares it with third parties.

Facebook is headquartered in California. ER88. The facial-recognition process takes place, and templates are stored, on Facebook's servers. None of those servers is located in Illinois. ER201-02. None of the Facebook employees involved in developing facial-recognition technology is based in Illinois, and none of the work that has ever been done to design, engineer, or implement Facebook's facial-recognition technology has taken place in Illinois. *Id.*

---

[3] Facebook creates and stores a template—a series of numbers—when a user (1) has been tagged in at least one photo; (2) has not opted out of Tag Suggestions; and (3) satisfies other privacy-based and regulatory criteria. ER223-24. Facebook does not create templates for non-users or for users under age 18. ER58, 225.

### C. Facebook's Disclosures About Tag Suggestions

Facebook fully discloses its facial-recognition technology to its users, and requires every person who joins Facebook to affirmatively assent to the use of this technology. When a person signs up for Facebook, he must agree to its terms and conditions, which permit Facebook to collect and use data in accordance with its Data Policy. ER82. At all times relevant to this case, the Data Policy explained how Tag Suggestions works, the purpose of the feature, and how users can turn the feature off:

> We also use information we have to provide shortcuts and suggestions to you. For example, ***we are able to suggest that your friend tag you in a picture by comparing your friend's pictures to information we've put together from your profile pictures and the other photos in which you've been tagged.*** If this feature is enabled for you, you can control whether we suggest that another user tag you in a photo using the "Timeline and Tagging" settings. . . . We store data for as long as it is necessary to provide products and services to you and others, including those described above. Information associated with your account will be kept until your account is deleted, unless we no longer need the data to provide products and services.

ER67, 69 (emphasis added). *See also* ER56-57 (similar disclosures in prior versions of the Data Policy); ER71-76.[4]

---

[4] The language quoted above is from the version in place at the time discovery closed in this case. Plaintiffs acknowledged below that previous versions of the Data Policy, including the versions in place when they signed up, contained substantially similar disclosures. *See* ER85.

### D. Plaintiffs' Complaint

The three named plaintiffs—Carlo Licata, Adam Pezen, and Nimesh Patel—filed the operative consolidated complaint on August 28, 2015. ER94.[5] Plaintiffs allege that they are Illinois residents with active Facebook accounts, and that Facebook violated Sections 14/15(a) and (b) of BIPA by obtaining "scans of face geometry" from their photos without giving them prior notice or obtaining their written release. ER95, 99-100, 108. Plaintiffs assert that Facebook's conduct "violated" their "privacy rights," but do not claim any injury as a result. ER103-05. Nor do they claim that Facebook disclosed their data to third parties or violated the provisions of BIPA regulating such disclosures.

### E. Facebook's Motions to Dismiss

Facebook moved to dismiss under Rule 12(b)(6), arguing that plaintiffs' claims were barred by (1) a California choice-of-law provision in Facebook's terms, and (2) BIPA's exception for information derived from photographs. Dkt. 69. The district court denied Facebook's motion on May 5, 2016. ER26-47.

The court first found, based on an evidentiary hearing, that "all

---

[5] The action originated as three separate cases filed in Illinois courts. ER16. The cases were transferred to the Northern District of California and consolidated before Judge Donato.

three plaintiffs assented to [Facebook's] user agreement when they signed up for Facebook," and that "all three plaintiffs agreed to the current user agreement" by "continuing to use Facebook after receiving" notice of changes. ER39-40. But the court declined to enforce the "contractual California choice-of-law provision," concluding that BIPA "embodies a fundamental policy . . . of protecting its citizens' privacy interests in their biometric data," and "California law and policy will suffer little, if anything at all, if BIPA is applied." ER40-44.

The court then held that BIPA's exclusion of "information derived from" "photographs" did not bar plaintiffs' claims. ER46. Although BIPA was enacted in 2008, when digital photography was already the norm, the court held that "'[p]hotographs' is better understood to mean *paper prints* of photographs, not digitized images." *Id* (emphasis added).[6] This ruling rested on the court's view that the legislature meant to exclude only older identifiers while regulating "newer technology," even though (as Facebook pointed out) the statute regulates technologies that have existed for

---

[6] By 2007, millions of people used photo-sharing websites like Shutterfly, Snapfish, and Flickr, and mobile phones commonly had built-in cameras—including the iPhone, which launched that year. *See, e.g.*, Simon Hill, *From J-Phone to Lumia 1020: A Complete History of the Camera Phone*, https://www.digitaltrends.com/mobile/camera-phone-history; *The History of Photo Sharing*, https://blog.kissmetrics.com/wp-content/uploads/2011/12/photo-sharing.pdf.

decades (retina scans) or centuries (fingerprints). *Id.*

In June 2016, shortly after the Supreme Court decided *Spokeo*, Facebook moved to dismiss for lack of Article III standing, arguing that plaintiffs had not claimed any concrete harm. Dkts. 129, 227.

Before the Court ruled on the motion, Facebook took the depositions of the three named plaintiffs. All three testified that they had not been injured by Facebook's analysis of their photos (bolded emphases added):

***Carlo Licata:***

> Q. Do you believe that you've been harmed at all by tag suggestions?
> A. ***I'm unaware if I ever have or not.***
> Q. Okay. So that means—are you aware of losing any money because of facial recognition or tag suggestions on Facebook?
> A. No, I'm not.
> Q. Losing any property?
> A. No.
> Q. Are you aware of any other harm because of facial recognition or tag suggestions on Facebook?
> A. ***Not to my knowledge.***

ER216.

***Adam Pezen:***

> Q. Okay. Do you feel you're being harmed in some way by tag suggestion?
> A. Harmed? Um—
> MR. RHODES: Objection to the extent it calls for a legal conclusion. Go ahead.
> A. Being that I don't know details behind it, I—yeah, ***I could only speculate as to the actual risk.*** That's sort of my concern.

. . .
Q. Can you identify any money or property you have lost because of tag suggestions?
A. No.
Q. Okay. Can you identify any other harm that has occurred to you because of tag suggestions?
MR. RHODES: Objection. Vague. Calls for a legal conclusion.
A. ***I personally, no.***

ER220-21.

***Nimesh Patel***:

Q. Is [Tag Suggestions] a helpful feature that Facebook offers?
MR. WILLIAMS: Objection. Form.
A. ***It's a nice feature***.
Q. And you—it's nice because it saves you the trouble of having to manually tag one of your friends; correct?
A. Yeah, yes.
. . .
Q. You realize you can opt out of tag suggestions; correct?
A. ***I believe so.***
Q. But you've never done that, have you?
A. ***No, I have not done that.***
Q. How come?
A. Not sure.
Q. Is it because you like the feature?
A. ***The feature's nice.***

ER210.

At the hearing on Facebook's motion to dismiss, plaintiffs' counsel conceded that his clients had suffered no "consequential harm":

> THE COURT: You're not contending that Facebook sold [biometric data to] a third party, used it for advertising purposes or did anything else ***downstream from the actual collection that has harmed your client***; is that right?

MR. TIEVSKY: No. We don't believe that any consequential harm—***we don't know if any consequential harm resulted. We haven't found that it happened.***

ER90-91 (emphases added).

The court denied Facebook's motion on February 26, 2018. ER16-25. As discussed in detail below, the court held that "the Illinois legislature codified a right of privacy in personal biometric information," and "the abrogation of procedural rights mandated by BIPA necessarily amounts to a concrete injury"; no "real-world harm" is required. ER21.

### F. Class Certification and Facebook's Rule 23(f) Appeal

While Facebook's Rule 12(b)(1) motion was pending, plaintiffs moved to certify a class. Dkt. 255. Facebook opposed the motion, asserting the Rule 23 arguments it raises here. Dkt. 285. On April 16, 2018, the district court certified a Rule 23(b)(3) class of "Facebook users located in Illinois for whom Facebook created and stored a face template after June 7, 2011" (ER5), holding that there were no individualized issues in the case that affected class certification (ER7-14). On April 30, 2018, Facebook filed a timely petition for leave to appeal the district court's ruling under Rule 23(f). ER165-94.[7]

---

[7] While this motion was pending, the district court denied the parties' cross-motions for summary judgment. Dkt. 372.

On May 11, 2018, less than two months before the scheduled July 9 trial date, plaintiffs moved for approval of a class notice plan. Dkt. 370. On May 21, over Facebook's objection, the district court ruled that Facebook would be required to send notice via three different channels—"jewel" notifications and News Feed posts on Facebook's service, as well as emails to users—nine days from the date of the order. ER49-50. Although the court had previously indicated that the class was limited to Illinois "residents" (ER5-6), it ordered Facebook to disseminate notice to "all users present in Illinois for 60 continuous days or longer" during the class period (ER49), explaining that someone is "potentially part of the class" if he has been in Illinois "for any period of time and [is] not just passing through" when his "template[] [was] harvested from data" (ER52-53).

On May 25, 2018, Facebook filed an emergency motion under Circuit Rule 27-3 to stay the proceedings below. The Court granted both Facebook's Rule 23(f) petition and its motion for stay. ER48.

**STANDARD OF REVIEW**

In a Rule 23(f) appeal, this Court generally "limits its review to whether the district court correctly selected and applied Rule 23's criteria." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 956 (9th Cir. 2009) (alterations omitted). The exception is Article III

standing, which is jurisdictional and therefore properly considered in an interlocutory appeal. *See Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1098-99 (9th Cir. 2017) (in "interlocutory appeals from denials of class-action certification," "[w]e first address whether [the plaintiff] has properly asserted Article III standing"); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001).

This Court reviews a "standing determination de novo." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018). It reviews an "order on class certification for an abuse of discretion." *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 629 (9th Cir. 2018). "An error of law," however, "is a per se abuse of discretion." *Id.* Accordingly, the Court "first review[s] a class certification determination for legal error under a de novo standard, and if no legal error occurred, [it] proceed[s] to review the . . . decision for abuse of discretion." *Id.* (quotation marks omitted).

## SUMMARY OF ARGUMENT

No class should have been certified for three independent reasons. First, plaintiffs lack Article III standing because they have not been harmed by Facebook's alleged conduct. Second, common issues do not predominate because each of the millions of class members will have to make a fact-intensive showing (a) that the "majority of circumstances

related" to his alleged BIPA violation occurred in Illinois and (b) that he was "aggrieved"—injured—"by a violation of" BIPA. Third, a class action is not superior, and would violate due process, because it could result in a multi-billion-dollar statutory award untethered to any injury and contrary to BIPA's intent.

Only the Article III and Rule 23 issues are before the Court in this Rule 23(f) appeal. But the breadth of errors that have occurred in this case is important for context: The district court has adopted a conception of BIPA that is fundamentally different from the one set forth in its text and legislative findings. BIPA is a narrow statute that regulates a defined set of biometric technologies and permits redress for injuries caused by an in-State violation of those regulations. The district court, however, has concluded that BIPA creates a freewheeling "right of privacy in personal biometric information," designed to subject "modern online services" to damages for any violation of the statute's requirements. ER13, 21.

This basic misconception led the district court to commit two serious legal errors early in the litigation (which are not at issue in this appeal). First, after finding that plaintiffs had validly agreed to be governed by *California* law in any action against Facebook, the district court held that Illinois law applied in this case—concluding that the parties' contractual

choice of law was trumped by the "fundamental policy" of Illinois to "protect[] its citizens' privacy interests in their biometric data." ER42. Then, even though BIPA excludes "information derived from" "photographs," the court applied it to technology that *indisputably* works by analyzing such data—concluding that BIPA's "focus is on newer technology" like "face recognition software," as opposed to "physical identifiers that are more qualitative and non-digital in nature." ER46.

The court's erroneous conception of BIPA then produced the rulings at issue here: The court held that a BIPA plaintiff need not show *any* real-world harm to establish Article III standing—contrary to *Spokeo* and this Court's precedents applying it—on the theory that BIPA "codifie[s] a right of privacy in personal biometric information" that is "crucial in our digital world." ER21. The court held that an Illinois resident can invoke BIPA regardless of where the defendant's conduct or the plaintiff's injury took place—contrary to the legislature's decision to cabin BIPA to violations that occur *within Illinois*—"because the functionality and reach of modern online services like Facebook's cannot be compartmentalized into neat geographic boxes." ER13. The court rejected the proposition that plaintiffs must prove something "*beyond* the alleged statutory violation" to recover (ER9), even though BIPA specifically requires a

plaintiff to show that he is "*aggrieved* by a violation." And the court saw no problem with a no-injury class action where "statutory damages could amount to billions of dollars," because BIPA does not "clearly" "foreclose" *all* "class actions." ER15.

The class certification order is the product of numerous independent errors—each of which flowed from the court's boundless reading of BIPA.

## ARGUMENT

### I. PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THEY HAVE ARTICLE III STANDING.

The district court lacked subject-matter jurisdiction: Plaintiffs failed to establish the concrete injury required for Article III standing.

To satisfy the "irreducible constitutional minimum" of Article III standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), a plaintiff must show that he "has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000). Where, as here, a case has reached "the summary judgment stage," the named plaintiffs must make "a *factual* showing of perceptible harm." *Lujan*, 504 U.S. at 566 (emphasis added).

An alleged violation of a statute does not, by itself, establish standing. In *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), the Supreme

Court held that "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 1549-50. That injury "must actually exist"—it must be "real," not "abstract." *Id.* at 1548-49. On remand, this Court confirmed that "even when a statute has allegedly been violated, Article III requires such violation to have caused some real—as opposed to purely legal—harm to the plaintiff." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1112 (9th Cir. 2017) ("*Robins*"). When a plaintiff alleges that he was harmed by a procedural violation of a statute, he must demonstrate two things: (1) that "the statutory provisions at issue were established to protect [the plaintiff's] concrete interests"; and (2) that "the specific procedural violations alleged in th[e] case actually harm, or present a material risk of harm, to such interests." *Id.* at 1113.

That test applies here because, as the district court acknowledged, BIPA's notice-and-consent provisions are "procedural protections" rather than substantive requirements. ER21 (describing the "procedural rights mandated by BIPA"). The statute does not *prohibit* the collection or storage of biometric data; it imposes a *process* that an entity must follow (provide notice and obtain a written release) before it can collect such data. *See, e.g.*, *Goings v. UGN, Inc.*, 2018 WL 2966970, at *2 (N.D. Ill. June 13, 2018) ("[F]ailure to comply with [BIPA's] notice and consent provisions . . .

[is] adequately described as procedural."); *Aguilar v. Rexnord, LLC*, 2018 WL 3239715, at *2 (N.D. Ill. July 3, 2018) (same).[8]

Plaintiffs have satisfied neither element of this Court's test.

### A. Plaintiffs Have Not Invoked a BIPA Provision that Protects Concrete Interests.

The district court determined that, in enacting BIPA, "the Illinois legislature codified a right to privacy in personal biometric information," and that this right is "crucial in our digital world." ER52. This analysis misses the key questions: what *concrete* interests are protected by BIPA; and whether those interests are implicated by the *specific* "statutory provisions *at issue*." *Robins*, 867 F.3d at 1113 (emphasis added).

Several federal district courts have correctly held that "[t]he only

---

8 This Court's most recent decisions indicate that the *Robins* test would apply even if the relevant statutory provisions were substantive, and confirm that concrete harm is always the baseline requirement: "In assessing constitutional standing, we must always analyze whether the alleged harm is concrete"; "[t]he 'substantive' and 'procedural' analyses that have appeared in [this Court's] case law are variations on that calculus." *Bassett v. ABM Parking Servs, Inc.*, 883 F.3d 776, 782 n.2 (9th Cir. 2018); *see also Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 727 n.2 (7th Cir. 2016) ("[w]hether [a] right is characterized as 'substantive' or 'procedural,' its violation must be accompanied by an injury-in-fact"). To the extent the *Robins* test would allow a plaintiff to establish standing without any showing of concrete injury, Facebook submits that such a rule is inconsistent with *Spokeo* and this Court's other precedents applying it. Any injury must also bear a "close relationship" to one that was "regarded as providing a basis for a lawsuit" at the time of the framing. *Spokeo*, 136 S. Ct. at 1549.

concrete interest protected by the BIPA is biometric data *protection*," not a general "right to privacy in . . . biometrics." *Vigil v. Take-Two Interactive Software, Inc.*, 235 F. Supp. 3d 499, 510, 514 (S.D.N.Y. 2017) (emphasis added), *aff'd in part, rev'd in part on other grounds*, 717 F. App'x 12 (2d Cir. 2017); *see Howe v. Speedway LLC*, 2018 WL 2445541, at *5 (N.D. Ill. May 31, 2018) ("[T]he concrete interest underlying BIPA is the protection and security of biometric data."); *McCollough v. Smarte Carte, Inc.*, 2016 WL 4077108, at *3-4 (N.D. Ill. Aug. 1, 2016) (finding it "difficult to imagine" how a BIPA violation could establish standing absent an "allegation that [biometric] information was disclosed or at risk of disclosure"). "The BIPA represents the Illinois legislature's judgment that the collection and storage of biometrics . . . is not in-of-itself undesirable or impermissible; instead, the purpose of BIPA is to ensure that . . . the private entity protects the individual's biometric data, and does not use that data for an improper purpose." *Vigil*, 235 F. Supp. 3d at 504.[9]

---

[9] Judge Donato found *Vigil* and *McCollough* distinguishable because those plaintiffs "indisputably knew that their biometric data would be collected." ER23. But whether a statute protects a concrete interest does not depend on the *facts of a case*; it depends on the meaning of the *statute*. In any event, the district court's distinction is illusory. The plaintiffs in *Vigil* and *McCollough* may have known that their faces and fingers were being scanned, but just like plaintiffs here, they claimed *not* to know that

Three provisions of BIPA directly implicate the statute's concrete interest in data protection: A private entity may not "sell, lease, trade, or otherwise profit" from someone's biometric data (740 ILCS 14/15(c)); it may not "disclose" or "disseminate" such data (*id.* 14/15(d)); and it must "protect" such data "from disclosure" (*id.* 14/15(e)). But plaintiffs here have not invoked those provisions; they have invoked only BIPA's provisions requiring entities to provide notice and consent before *collecting and retaining* someone's biometric data. *See id.* 14/15(a), (b).

"Unlike statutes where the provision of information about statutory rights, or matters of public concern, is an end itself, the BIPA's notice and consent provisions do not create a separate interest in the right-to-information, but instead operate in support of the data protection goal of the statute." *Vigil*, 235 F. Supp. 3d at 513. These requirements do not *themselves* "create a standalone concrete interest." *Speedway*, 2018 WL 2445541, at *5. *See also Vigil*, 235 F. Supp. 3d at 510 (dismissing complaint on this basis); *McCollough*, 2016 WL 4077108, at *3-4 (same); *cf. Dixon v. Wash. & Jane Smith Cmty.*, 2018 WL 2445292, at *9 (N.D. Ill. May 31, 2018) (plaintiff had standing where, "*in addition* to alleging what

---

the defendants would collect their "biometric data" and what that entailed. *Vigil*, 235 F. Supp. 3d at 506; *McCollough*, 2016 WL 4077108, at *3.

might accurately be characterized as 'bare procedural violations' of BIPA, [she] also has alleged that Smith *disclosed* her fingerprint data to Kronos [a third party] without her knowledge" and thereby "violated her right to privacy in her biometric information" (second emphasis added)).

This case is therefore governed by the rule in *Bassett v. ABM Parking Services, Inc.*, 883 F.3d 776 (9th Cir. 2018). There, Steven Bassett alleged that the defendant provided him with a credit card receipt that contained information prohibited by a provision of the Fair Credit Reporting Act ("FCRA"). *Id.* at 777. The Court held that this *particular* provision did not protect a "substantive right" or a "concrete interest": "To the extent FCRA arguably creates a 'substantive right,' it rests on nondisclosure of a consumer's private financial information to identity thieves." *Id.* at 780, 782. Because "Bassett's private information was not disclosed," his claim did not implicate a "substantive right." *Id.* at 782-83.

For this reason, it is irrelevant here whether (as the district court noted) "[v]iolations of the right to privacy have long been actionable at common law." ER21-22. "*Without disclosure of private information to a third party*, it hardly matters that actions to remedy invasions of privacy . . . have long been heard by American courts." *Bassett*, 883 F.3d at 783 (emphasis added) (ellipsis omitted); *cf. Eichenberger v. ESPN, Inc.*,

876 F.3d 979, 981 (9th Cir. 2017) (plaintiff had standing to invoke statute precluding entities from *disclosing* someone's "personally identifiable information" to third parties); *Robins*, 867 F.3d at 1115 ("Courts have long entertained causes of action to vindicate intangible harms caused by certain untruthful *disclosures* about individuals." (emphasis added)).[10]

Plaintiffs have failed to satisfy the first prong of this Court's test.

**B. Plaintiffs Have Suffered No Real-World Harm.**

This Court has interpreted the second *Robins* prong to require "a real harm or a material risk of harm" to the *plaintiff*. *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1174 (9th Cir. 2018); *see also id.* at 1175 ("Having made a showing that 'the statutory provision[ ] at issue [was] established to protect his concrete interests,' Dutta must also demonstrate how the 'specific' violation of [the statute] alleged in the complaint actually harmed or 'present[ed] a material risk of harm' *to him*" (emphasis added) (quoting *Robins*, 867 F.3d at 1113)). "A plaintiff seeking

---

10 *See also, e.g.*, *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 912 (7th Cir. 2017) (no "violation of the plaintiff's privacy" absent "indication that [defendant] released, or allowed anyone to disseminate, any of the plaintiff's personal information"); *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016) (no standing where plaintiff did "not allege that [the defendant] disclosed [her personally identifiable] information to a third party"); *cf. In re Horizon Healthcare Servs., Inc. Data Breach Litig.*, 846 F.3d 625, 639 (3d Cir. 2017) ("unauthorized dissemination of personal information" constitutes injury-in-fact).

damages for violation of a statutory right must *not only* plausibly allege the violation but must *also* plausibly allege a 'concrete' injury causally connected to the violation." *Id.* at 1172 (emphasis added); *see also Syed v. M-I, LLC*, 853 F.3d 492, 499 (9th Cir. 2017) (initial opinion based Article III standing on statutory violation alone; amended opinion based standing on allegation that plaintiff would not have authorized credit check "had [the waiver notice] contained a sufficiently clear disclosure, as required in the statute"); *Meyers*, 843 F.3d at 728-29 (Article III requires "showing of injury *apart* from the statutory violation" (emphasis added)). The district court simply declined to apply this requirement. ER21. This was error.[11]

### 1. Plaintiffs Have Disclaimed Any Actual Harm.

At their depositions, plaintiffs expressly disavowed any injury. When asked if he was aware of any "harm because of facial recognition or tag suggestions on Facebook," Mr. Licata testified: "Not to my knowledge." ER216. Mr. Pezen "could only speculate as to the actual risk," and could

---

[11] The court determined that *Spokeo* merely "sharpened the focus on when an intangible harm *such as the violation of a statutory right* is sufficiently concrete." ER19 (emphasis added). Driven by its assumption that a "violation of a statutory right" is *equivalent* to an "intangible harm," the court went on to conclude that "the abrogation of the procedural rights mandated by BIPA necessarily amounts to a concrete injury." ER21. That statement flatly contradicts *Spokeo*: a "bare procedural violation, divorced from any concrete harm," is insufficient. 136 S. Ct. at 1549.

not "personally" identify "harm that has occurred to [him]." ER220-21. Nimesh Patel thinks Tag Suggestions is a "nice feature" and has not opted out even though he "realize[s]" that he can. ER210. As plaintiffs' counsel candidly admitted: "[W]e do not know if any consequential harm resulted. We haven't found that it happened." ER90-91.

Under *Dutta*, the absence of real harm is dispositive. There, the plaintiff applied for a job with State Farm, but was rejected based on his poor credit history. He claimed that "the credit report obtained by State Farm contained errors, which State Farm considered without providing him sufficient notice" under a provision of FCRA requiring prospective employers to "provide a job applicant with a copy of his consumer credit report, notice of his FCRA rights, and an opportunity to challenge inaccuracies in the report 'before taking any adverse action based in whole or in part on the report.'" 895 F.3d at 1169-70. Mr. Dutta thus alleged that State Farm (1) violated FCRA's notice provision by considering negative, false information in his credit report, and (2) denied him a job.

But after examining the record in detail, this Court held that Mr. Dutta nevertheless lacked standing because he failed to show that the statutory violation made a real-world *difference*: He would have been disqualified from the job based on the *accurate* information in the credit

report, without regard to the errors. *Id.* at 1176. "Consequently, although Dutta made a plausible showing of State Farm's procedural violation of FCRA, he failed to establish facts showing he suffered actual harm or a material risk of harm." *Id.* at 1176. *Compare Robins*, 867 F.3d at 1117 (plaintiff "specifically alleged that he [wa]s out of work and looking for a job," and that FCRA violations caused him "anxiety, stress, concern, and/or worry about his diminished employment prospects").[12]

This is an easier case. Unlike Mr. Dutta and Mr. Robins, plaintiffs have never *attempted* to show that anything in their lives would have changed had Facebook provided additional or different disclosures. They have never claimed any harm at all, let alone that they were harmed by the *difference* between Facebook's disclosures and those they claim BIPA requires. By affirmatively disavowing "consequential harm" from the alleged BIPA violation, plaintiffs conceded themselves out of federal court.

**2. Alleging a "Privacy Violation" Is Insufficient.**

Plaintiffs' complaints alleged that Facebook "violated Plaintiffs' . . .

---

12 *See also Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998, 1002-03 (11th Cir. 2016) (plaintiff was not "harmed when th[e] statutory right was violated": he "does not allege that he lost money," that "his credit suffered," or "that he or anyone else was aware that the certificate of discharge had not been recorded"); *Meyers*, 843 F.3d at 727; *Lee v. Verizon Commc'ns*, 837 F.3d 523, 529-30 (5th Cir. 2016).

rights to privacy in their biometric identifiers." ER108. They testified similarly at their depositions that Facebook's collection of their alleged biometric identifiers was an invasion of privacy. ER211, 213-14, 219.[13]

As discussed above (at pp. 25-26), this Court has been unwilling to recognize a "privacy violation" as a basis for standing absent a disclosure to a third party. But in any event, the mere *assertion* that a plaintiff's "privacy" has been "violated," untethered to any allegation of injury or risk of injury, cannot substitute for the "factual showing of perceptible harm" required for standing. *Lujan*, 504 U.S. at 566. "Invasion of privacy [is] not an injury itself." *Nayab v. Capital One Bank, N.A.*, 2017 WL 2721982, at *3 (S.D. Cal. June 23, 2017). An "allegation that [a plaintiff] felt that her privacy was invaded is [ ] insufficient"; the plaintiff must show an "identifiable harm" to her privacy interests. *Id.*; *see also Speedway*, 2018 WL 2445541, at *4 (in BIPA case, alleging an "invasion of privacy injury" cannot "support standing"); *Goings*, 2018 WL 2966970, at *3.

Plaintiffs have not claimed that the collection and storage of their

---

13 Plaintiffs' complaints also claimed that Facebook "misappropriated the value of [their] biometric identifiers." ER103-05. But they abandoned this claim at their depositions. *See* pp. 13-14 *supra*. In any event, plaintiffs never attempted to explain how any value of their biometric data was diminished by Tag Suggestions. The district court noted at an early hearing that their "economic" theory "simply cannot be right." ER93.

data caused "identifiable harm" to their privacy interests. They have not claimed that they suffered emotional harm; that they were caught in a compromising situation that materially affected their reputations, livelihoods, or relationships; or that anyone other than Facebook had access to their facial templates. Indeed, they have never explained *why* they believe their privacy has been invaded—for example, why Mr. Patel believes that he has suffered an invasion of privacy from technology that he considers "nice" and has deliberately chosen to use, even though he could opt out of it without otherwise affecting his experience on Facebook.

Ultimately, plaintiffs' vague references to "privacy violations" are nothing more than restatements of their claim that Facebook violated BIPA. If a plaintiff could establish Article III standing merely by *saying* his privacy rights were "invaded" by the defendant's alleged violation, the injury-in-fact requirement would be meaningless.

### 3. Facebook Disclosed the Relevant Conduct.

Because plaintiffs have failed to adduce any evidence of harm, they would lack standing even if Facebook had disclosed nothing about its technology. But Facebook's Data Policy—to which plaintiffs assented (*see* pp. 10-12 *supra*)—states in plain terms that Facebook is "able to suggest that your friend tag you in a picture by comparing your friend's pictures to

information we've put together from your profile pictures and the other photos in which you've been tagged." ER67. It also tells users that Facebook "store[s] data for as long as it is necessary to provide products and services to you and others, including [Tag Suggestions]," and that any "[i]nformation associated with your account will be kept until your account is deleted, unless we no longer need the data." ER69.

Plaintiffs do not contend that Facebook used their data for any purpose other than the one it disclosed: to suggest tags to people they chose to connect with. To the contrary, Mr. Licata conceded at his deposition that Facebook informed users of the exact data analyses alleged in the complaint. He was asked what he wanted Facebook to "change . . . as a result of this suit." ER215. He answered:

> A. To make it very evident that this is taking place.
> Q. But you agree, from what I've shown you this afternoon [Facebook's Data Policy], Facebook makes it evident; correct?
> ***A. They do make it evident.***

*Id.* (emphasis added).

Facebook also tells people how to opt out if they don't *want* Facebook to use facial-recognition technology on photos of them to suggest tags. *See* p. 9 *supra.* [redacted]

[redacted] *Id.* Because plaintiffs knew exactly what data Facebook was collecting, for what purpose, and how to opt out of Tag Suggestions, they cannot claim that they were harmed by Facebook's alleged failure to comply with BIPA's specific disclosure requirements.

Because plaintiffs lack standing, "neither the district court nor this [C]ourt has the authority to certify a class action." *Meyers*, 843 F.3d at 729. The Court should vacate the grant of class certification and direct the district court to dismiss the case for lack of subject-matter jurisdiction.

## II. COMMON ISSUES DO NOT PREDOMINATE BECAUSE EACH CLASS MEMBER'S ABILITY TO INVOKE BIPA DEPENDS ON INHERENTLY INDIVIDUALIZED QUESTIONS.

If the Court holds that the district court had jurisdiction, it should hold that no class may be certified under Rule 23. Plaintiffs cannot satisfy Rule 23(b)(3)'s "demanding" requirement that "questions of law or fact common to the class members predominate over any questions affecting only individual members." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013). The district court's contrary decision was based on "error[s] of law" and is therefore "a per se abuse of discretion." *Sali*, 889 F.3d at 629.

The district court held that the certified class poses two "common legal and factual questions": "did Facebook's facial-recognition technology

harvest biometric identifiers as contemplated under BIPA, and if so, did Facebook give users prior notice of these practices and obtain their consent" in accordance with BIPA. ER8. But whether or not these issues are common, both are premised on a class member's *ability to invoke BIPA in the first place.* Each class member must make two inherently individualized showings to establish that he has a cause of action under the statute: (1) that the application of BIPA to his claim would not be impermissibly extraterritorial; and (2) that he has suffered a sufficient injury to be a "person aggrieved" under BIPA. These are both *threshold* questions: Even if both of the purportedly "common" questions were answered in plaintiffs' favor, that would not establish liability to a single class member. Each requirement independently defeats predominance.

### A. Illinois' Extraterritoriality Rule Defeats Predominance.

The district court's decision to reject the parties' choice of California law (*see* pp. 11-12 *supra*) is not before the Court in this Rule 23(f) appeal.[14]

---

[14] The ruling was error. The district court misread BIPA's purpose and considered the statute in a vacuum, failing to account for Illinois' strong policy in favor of enforcing choice-of-law clauses. *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 156 Ill. App. 3d 755, 759 (1987). It also gave inadequate weight to the policy choices of *California*, which has (1) considered and rejected a similar statute and (2) legislatively expressed its strong interest in encouraging technological innovation. Cal. Sen. Bill No. 169 (July 5, 2001) (bill that would have regulated "facial recognition technology"); 2012 Cal. Leg. Serv. Ch. 733 § 1(a)(1) (S.B. 1161) (Sept. 28, 2012).

But having decided to apply Illinois law, the district court was obligated to apply *all* of Illinois law—including the State's strict extraterritoriality doctrine. It failed to do so. The district court's ruling—that BIPA could sweep in any conduct, whether inside or outside Illinois, that affects people "located in Illinois"—effectively gives BIPA nationwide effect and negates the legislature's policy to cabin the statute to conduct that takes place within its borders. Properly applied, Illinois' extraterritoriality doctrine is fatal to predominance.

### 1. The District Court Erred in Holding that a Plaintiff's "Location" in Illinois Is Sufficient to Establish a Domestic Application of BIPA.

For almost a century, Illinois has had a "long-standing rule of construction" that a "statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 184-85 (2005). Whether a statute "should be given extraterritorial effect is a question of policy . . . for the legislature, not the courts, to ponder and decide." *Graham v. Gen. U.S. Grant Post No. 2665, V.F.W.*, 43 Ill. 2d 1, 7 (1969). The courts have uniformly recognized that "BIPA does not have extraterritorial reach." ER12.

Accordingly, to invoke BIPA, a plaintiff must prove that a violation

of the statute took place "primarily and substantially" in Illinois. *Avery*, 216 Ill. 2d at 187. This means that "the *majority* of circumstances related to the alleged violation" must occur in that State. *Landau v. CNA Fin. Corp.*, 381 Ill. App. 3d 61, 63-65 (2008) (emphasis added). If a "necessary element of liability did not take place in Illinois," *Graham*, 43 Ill. 2d at 4, a plaintiff has "no cause of action," *Avery*, 216 Ill. 2d at 190.

Although the district court cited *Avery* (ER12), it did not apply this test. The court held instead that "this case is deeply rooted in Illinois" because "[t]he named plaintiffs are *located* in Illinois along with all of the proposed class members." *Id.* (emphasis added). The court reserved for the "claim stage" the question of what it means to be "located in Illinois." ER53.[15] Ultimately, however, it makes no difference. Under Illinois law, even the narrowest meaning of "location"—legal residency—would not be

---

[15] In its opinion on class certification, the court suggested that whether a person is "located in Illinois" depends on Illinois residency. ER13. More recently, the court suggested that someone is "potentially part of the class" if he has been in Illinois "for any period of time and [is] not just passing through" at the time his "template[] [was] harvested from data." ER52-53. It was improper for the court to reserve this issue for the "claims stage": A plaintiff must satisfy the extraterritoriality test to establish *liability* under BIPA (*Avery*, 216 Ill. 2d at 190), and Facebook therefore has a right to litigate this issue before a *jury*. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (plurality op.) (under Rules Enabling Act, class action rules "alter only how the claims are processed" and "leave[] the parties' legal rights and duties intact").

sufficient to permit a plaintiff to invoke BIPA.

In *Graham*, the Illinois Supreme Court dismissed a suit under the Dram Shop Act based on injuries from a drunk-driving accident. 43 Ill. 2d at 2. The plaintiff, the drunk driver, and the defendant liquor stores were *all* "residents of Illinois." *Id.* But because the legislature had not given the statute extraterritorial effect, and because "the automobile accident"—a "necessary element of liability" under the Dram Shop Act—"occurred in Wisconsin," the statute did not apply. *Id.* at 2, 4.

The Supreme Court confirmed in *Avery* that the extraterritoriality test is *not* "based on the residency of the plaintiff" but rather on whether the facts related to the alleged statutory violation "occur primarily and substantially within" Illinois. 216 Ill. 2d at 182, 186; *see also Valley Air Servs. v. Southaire, Inc.*, 2009 WL 1033556, at *12 (N.D. Ill. Apr. 16, 2009) (explaining that *Avery* considered a test based on the plaintiff's residency but "went on to adopt an entirely different test"). The residency of the parties (both the plaintiff and the defendant) is a *relevant* consideration, but a court must consider the *totality* of "circumstances relating to the alleged violation of the [statute]." *Landau*, 381 Ill. App. 3d at 65.

Courts in Illinois have applied this rule in a broad range of contexts, including Internet transactions. In *Vulcan Golf, LLC v. Google Inc.*, 552 F.

Supp. 2d 752 (N.D. Ill. 2008), the court dismissed a class action against several Internet companies that allegedly "engaged in a massive scheme to use deceptive domain names on the Internet to generate billions of advertising dollars at the expense of the plaintiffs." *Id.* at 759. Although "each [plaintiff was] a resident of the state" and "conduct[ed] substantial business in this state," there were "no allegations that plausibly suggest that the purported deceptive domain scheme occurred primarily and substantially in Illinois." *Id.* at 775. *See also Valley Air*, 2009 WL 1033556, at *12 (dismissing claim by "Illinois citizen" who "communicated with [the defendant] from Illinois" and "felt injury in Illinois," because the circumstances "at the heart of [the] claim" "occurred in Arkansas"); *Hackett v. BMW of N. Am., LLC*, 2011 WL 2647991, at *2 (N.D. Ill. June 30, 2011) (dismissing fraud claim brought by "Illinois resident" who "drove [an allegedly defective] vehicle in Illinois" and "experienced [a fuel-pump] failure in Illinois," because the "fraudulent conduct" occurred elsewhere).

The district court held that residency was sufficient without mentioning *Graham*, the portion of *Avery* rejecting a residence-based test, or the other cases cited above. It simply substituted its own policy preference—that Illinois residents should be able to sue under an Illinois

statute—for that of the General Assembly.[16]

The legislature certainly has the *power* (subject to federal constitutional constraints) to enact a statute that allows residents to sue entities that commit out-of-state violations—by expressly giving the statute extraterritorial effect, as it has in other contexts. *See, e.g.*, *Miller UK Ltd. v. Caterpillar Inc.*, 2017 WL 1196963, at *7 (N.D. Ill. Mar. 31, 2017). Because it declined to do so here—a decision that "may well have been prompted by a variety of reasonable policy considerations" (*Graham*, 43 Ill. 2d at 7)—each class member must prove an in-State BIPA violation.

#### 2. An Individualized, Multi-Factor Analysis Is Necessary for Each Class Member.

Under *Avery*, "*each case must be decided on its own facts*." 216 Ill. 2d at 187 (emphasis added). Among other things, "the Illinois Supreme Court has considered" "the claimant's residence"; "the defendant's place of business"; "the location of the relevant item" in dispute; "the location of the claimant's contacts with the defendant"; "where [any] contracts at issue

---

[16] The district court also said that plaintiffs' "claims are based on the application of Illinois law to the use of Facebook mainly in Illinois." ER12. This statement is doubly flawed: It conflates extraterritoriality with the question of *which* state's law applies. *See Graham*, 43 Ill. 2d at 5-6 (extraterritoriality is not a question "of conflict or choice of laws"). And there was no evidence that the plaintiffs—much less the absent class members—"use[d] Facebook mainly in Illinois." Plaintiffs put in *no* proof on this issue, which plainly will vary among individual class members.

were executed"; and the place of "injury." *Haught v. Motorola Mobility, Inc.*, 2012 WL 3643831, at *3-5 (N.D. Ill. Aug. 23, 2012).

Courts have emphasized "the impropriety of class certification" in cases that require a "heavily fact-bound analysis." *Jones v. Takaki*, 38 F.3d 321, 324 (7th Cir. 1994), *abrogated on other grounds by Smith v. City of Chicago*, 524 F.3d 834 (7th Cir. 2008). Indeed, *Avery* itself concluded that class treatment was inappropriate due to distinctions in the abilities of putative class members to invoke an Illinois statute. 216 Ill. 2d at 190 (trial court erred in certifying class that "included members whose [insurance claims proceedings] took place outside of Illinois"); *see also, e.g.*, *Cruz v. Lawson Software, Inc.*, 2010 WL 890038, at *9 (D. Minn. Jan. 5, 2010) (no certification where statute did "not apply extraterritorially and an individualized inquiry into each putative class member would be necessary to determine whether [it] could be applied").

Most putative BIPA class actions do not present this problem. Since 2015, about 110 BIPA class actions have been filed against *Illinois* businesses (though to date, no class has been certified). Most involve the in-person collection of data, often by a local merchant or employer, and there is no dispute that the majority of circumstances surrounding the alleged violation took place in Illinois. In *Speedway*, for example, the

plaintiff was "an Illinois resident who worked at a Speedway gas station in Addison, Illinois," and had his finger scanned by the gas station in that city. 2018 WL 2445541, at *1.[17]

This case is different: the defendant is a California company that conducts facial recognition on servers outside Illinois and neither drafted nor disseminated the allegedly faulty disclosures from Illinois. A properly-instructed jury might conclude that because several "necessary element[s] of liability" (*Graham*, 43 Ill. 2d at 4) took place outside Illinois, BIPA does not apply to *any* class member's claim. But to the extent that BIPA is applicable at all, each class member will have to prove a sufficient Illinois connection by alleging other, individualized factors, such as:

- That he was in Illinois when he signed up for Facebook and agreed to the terms that allegedly failed to comply with BIPA;
- That the analyzed photo was taken in Illinois;
- That the photo was uploaded from Illinois;
- That he was in Illinois when the photo was taken and/or uploaded;
- That he was in Illinois when a facial-recognition analysis was performed on his photo;

---

[17] *See, e.g.*, *Rosenbach v. Six Flags Entm't Corp.*, 2017 IL App (2d) 170317, ¶¶ 1, 7 (finger scan in theme park in Illinois); *McCollough*, 2016 WL 4077108, at *1 (in-person fingerprint "[i]n Illinois").

- That he was in Illinois when a tag was suggested to his friend, or accepted by his friend, or when he was notified of the tag; and/or
- That his injury occurred in Illinois—for example, that he was in Illinois when he found out about Tag Suggestions and immediately became distraught, or that his co-workers in Illinois saw a damaging photo of him and he was fired.

Critically, as other courts have recognized, any combination of these connections to the State must be balanced against the undisputed fact that *none* of the actions by Facebook that are alleged to violate the statute took place in Illinois. *See, e.g.*, *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1102 (N.D. Ill. 2017) (in BIPA action against Google involving facial recognition, holding that extraterritoriality doctrine turned on multiple factors, including the parties' residency, where plaintiffs' photos were uploaded, and where "the alleged scans actually t[ook] place"); *Monroy v. Shutterfly, Inc.*, 2017 WL 4099846, at *6 (N.D. Ill. Sept. 15, 2017) (same).

Because the district court started with the flawed premise that residency was sufficient, it failed to analyze the implications of the multi-factor, fact-intensive extraterritoriality test for predominance. But even if the court had incorporated other location factors into the class definition, that would not have solved the fundamental problem: Each class member's situation would involve different *combinations* of facts. The court would therefore need to hold millions of mini-trials examining

all of the circumstances of each plaintiff's relationship to Facebook and experience with Tag Suggestions, and a factfinder would have to determine whether his particular circumstances are sufficient to counterbalance the fact that Facebook's conduct took place outside Illinois.

Consider this scenario: Fred signs up for Facebook and reviews its disclosures while at college at Florida State, and opts out of Tag Suggestions. A friend takes Fred's picture on campus, uploads it to Facebook, and manually tags him. Although the tag is connected to Fred's profile, no template is created because he has opted out. Two years later Fred graduates, moves to Chicago, and turns on Tag Suggestions. Using the photo that was uploaded and tagged back in Florida, Facebook creates and stores a template for Fred on its server in Oregon.

In Facebook's view, Fred could not invoke BIPA, because all of the facts at the heart of his claim—including Facebook's alleged collection of Fred's "biometric identifier" and its provision of disclosures about facial recognition—took place outside Illinois. But whether or not Fred *could* invoke the statute, what matters for present purposes is that, regardless of how the class is defined, a court will have to conduct this inquiry, and countless variations on it, for millions of people. And this scenario is by no means farfetched: Mr. Pezen signed up for Facebook while he was

attending college in Arizona (ER227-28); [redacted] (*see* p. 32-33 *supra*); and Oregon is home to one of Facebook's U.S. servers (ER201-02). None of the plaintiffs has claimed that he was in Illinois when a photo of him was uploaded or when any facial-recognition analysis was performed.

The district court acknowledged that "the claims of some class members may only be peripherally related to Illinois." ER14. It dismissed that problem out of hand, finding that the "functionality and reach of modern online services like Facebook cannot be compartmentalized into neat geographic boxes," and that it would be "undesirable" to "effectively gut the ability of states . . . to apply their consumer protection laws to residents for online activity." ER13.

But that was the Illinois *legislature's* decision to make. If the legislature had considered it "desirable" to apply BIPA's requirements outside the State, it had the "ability" to do so by giving the statute extraterritorial effect. It decided not to, and with good reason. Under the district court's rationale, Illinois courts would have to entertain claims under BIPA where every circumstance even arguably related to the alleged violation—the sign-up, the upload, the facial-recognition analysis, the storage of data, and the injury—took place outside the State.

Companies around the country that use facial recognition would have to conform their operations to the *single* state that has enacted a private right of action for the collection of biometric data. *See* n.2 *supra*.

In short: To determine whether a BIPA violation occurred in Illinois, a multitude of factors must be litigated and balanced for each class member. The district court circumvented this problem by adopting a policy contrary to that of the General Assembly, disregarding controlling precedent, and giving boundless effect to a carefully cabined statute. That was error; the extraterritoriality rule defeats predominance.

### B. The "Aggrieved" Requirement in BIPA's Private Right of Action Defeats Predominance.

To invoke BIPA's private right of action, every class member must show that he is "aggrieved by a violation of this Act." 740 ILCS 14/20. The Second District of the Illinois Appellate Court has held that a plaintiff may satisfy this requirement only by making a specific showing of "actual injury" *beyond* the collection of his biometric data without notice and consent. *Rosenbach v. Six Flags Entm't Corp.*, 2017 IL App (2d) 170317, ¶ 20. The plaintiff in *Rosenbach* appealed, and the case is currently pending before the Illinois Supreme Court; this Court may consider awaiting the Supreme Court's ruling before deciding this case. If, as Facebook expects, the Supreme Court agrees that an actual injury is

required, the "aggrieved" provision will require separate proceedings for each class member in this case, defeating predominance.[18]

#### 1. BIPA Requires a Showing of Actual Injury Beyond a Violation of the Notice-And-Consent Provisions.

In *Rosenbach*, the Illinois Appellate Court construed the "aggrieved" provision for the first time. Stacy Rosenbach alleged that her minor son went to the defendants' theme park without her and purchased a season pass, and that "his thumb was scanned into the Six Flags 'biometric data capture system.'" 2017 IL App (2d) 170317, ¶¶ 1, 7. She contended that the defendants violated BIPA by failing to provide her with notice or obtain her consent; that her son's "right to privacy" was "adversely affected"; and that, "had she known of defendants' conduct, she would not have allowed [him] to purchase the pass." *Id.* ¶¶ 1, 20. The trial court certified the question "whether an individual is an aggrieved person . . . when the only injury he or she alleges is a violation of [BIPA]." *Id.* ¶ 15. The Second District answered unanimously "in the negative." *Id.* ¶ 30. A plaintiff "is not aggrieved and may not recover" if she does not "alleg[e] any injury or adverse effect" beyond a violation of BIPA's notice-and-consent provisions. *Id.* ¶ 28. Otherwise, the term "aggrieved"

---

[18] If appropriate, Facebook will seek an opportunity to file supplemental briefing on the Supreme Court's decision after it is issued.

would be "superfluous." *Id.* ¶ 23.

The Supreme Court granted review in *Rosenbach* on May 30, 2018. 98 N.E.3d 36 (Ill. 2018). Briefing in that case closed on September 24. Oral argument has not yet been scheduled.

The First District of the Appellate Court recently disagreed with *Rosenbach*. In *Sekura v. Krishna Schaumburg Tan, Inc.*, 2018 IL App (1st) 180175, Klaudia Sekura alleged that a tanning salon violated BIPA "by collecting [her] fingerprints" without notice and consent, and "by disclosing her fingerprints to an out-of-state third party vendor." *Id.* ¶ 2. The First District held that the plaintiff had satisfied the "aggrieved" requirement: "Plaintiff alleges that [BIPA] provided her with 'legal rights,' and that she was 'deprived of [these] legal rights' by defendant's violations of the Act." *Id.* ¶¶ 53-54.[19] But the court also explained why the case was distinguishable from *Rosenbach*: Ms. Sekura alleged (1) that the

---

19 *Sekura* relied (at ¶ 52) on Black's Law Dictionary, which defines "aggrieved" as "having legal rights that are adversely affected." *Rosenbach* relied on the same definition, and correctly explained (at ¶ 20) that it "suggest[s] that there must be an actual injury, *adverse effect*, or harm in order for the person to be 'aggrieved.'" *Sekura* also found (at ¶ 59) that "[t]he whole purpose of [BIPA] is to prevent any harm from occurring in the first place, thereby reassuring the public." But there is no doubt that BIPA's notice-and-consent provisions are designed to prevent harm from occurring; the issue is whether the legislature intended to permit *lawsuits* by people who have not been injured.

defendant violated BIPA through "the disclosure of [biometric] information to an out-of-state third party vendor"—not merely by failing to comply with the notice-and-consent provisions—and (2) that she suffered "mental anguish" as a result. *Id.* ¶ 76.

### 2. Proof of Actual Injury Will Be Individualized, Precluding a Finding of Predominance.

If the Illinois Supreme Court holds that a violation of BIPA's notice-and-consent provisions, without more, is insufficient to make a plaintiff "aggrieved," this statutory injury requirement will plainly present an individualized issue that defeats predominance.

"[T]o meet the predominance requirement," a plaintiff must "show [ ] that the existence of individual injury resulting from [an alleged statutory violation is] capable of proof at trial through evidence that [is] *common to the class rather than individual to its members*." *Comcast*, 569 U.S. at 30 (emphasis added). "[P]redominance will not be satisfied if plaintiffs must prove that each class member suffered personal or economic injury." MCLAUGHLIN ON CLASS ACTIONS § 5:23 (14th ed. 2017). And when such a requirement is contained in a statute's "private right of action," it raises a particularly "serious predominance issue"—because it determines the threshold question of whether the plaintiff can sue. *Davis v. Nationstar Mortg., LLC*, 2016 WL 6822017, at *5 (N.D. Cal. Nov. 18, 2016).

BIPA's injury requirement will require individualized assessments of each of the millions of people in the certified class. The individualized issues will include: (1) whether each class member believes he has been harmed; (2) the form of any such alleged harm (emotional harm, reputational harm, monetary harm, or something else); (3) whether he has, *in fact*, suffered the claimed injury; and (4) whether, as a *legal matter*, the harm makes him a "person aggrieved."

Some class members, like the named plaintiffs (*see* Part I.B.1), will not identify any injury beyond the collection of their alleged biometric data. If others do, the allegations will inevitably vary, and Facebook will be entitled to probe their legal sufficiency and credibility through discovery and, if necessary, at trial. For example, if a class member claims harm to his privacy rights, but (as in *Rosenbach*) does not identify any resulting "adverse effect" (like a serious emotional or reputational harm), he is not "aggrieved." 2017 IL App (2d) 170317, ¶ 20. If a class member *does* allege a real privacy harm, but (like Mr. Licata) concedes that Facebook's disclosures clearly explained what Facebook was doing with his data and how to opt out, a fact-finder could reasonably reject his claim. *See Gulec v. Boeing Co.*, 698 F. App'x 372, 373 (9th Cir. 2017) (dismissing "invasion of privacy claim . . . in light of [plaintiff's] consent to the phone interviews").

A class member may claim that Tag Suggestions caused him emotional distress, but (as with Mr. Patel) his testimony may reveal that he likes the feature and still uses it. The potential variations are endless.

That is why this Court denies class certification when a statute requires proof of harm beyond the violation. In *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) (abrogated on other grounds by *Comcast*), the plaintiffs claimed that the defendants "induced numerous individuals to unwittingly sign up for a fee-based rewards program." *Id.* at 1016. The statute required proof that the deceptive conduct "caused them harm." *Id.* at 1022. Because there were "myriad reasons" why someone "who was not misled" might have "intentionally signed up," "the class could not be certified." *Id.* at 1024.

So too here: There are "myriad reasons" why a fully-informed person would participate in Tag Suggestions. Every plaintiff will have to prove that he was *not* fully informed, that he would have made a different decision if he *had* been more fully informed, and that he was harmed. This will require millions of mini-trials. *See Bruce v. Teleflora, LLC*, 2013 WL 6709939, at *7 (C.D. Cal. Dec. 18, 2013) ("When a case turns on individualized proof of injury, separate trials are in order."); *De Stefan v. Frito-Lay, Inc.*, 2011 WL 13176229, at *8 (C.D. Cal. June 6, 2011) ("[c]lass

certification [was] not appropriate" in suit under statute requiring "an 'actual injury,' above and beyond a technical violation of the statute"; "evaluation of the injury prong would require individualized inquiries into the way that alleged inaccuracies affected each class member").[20]

A recent New Jersey decision illustrates the particularized inquiries that arise from the inclusion of a statutory "aggrieved" requirement. A New Jersey statute prohibits businesses from offering contracts with provisions that "violate[] any clearly established right of a consumer" (N.J.S.A. 56:12-15), and provides a private right of action to any "aggrieved consumer" (*id.* 56:12-17). In *Spade v. Select Comfort Corp.*, 232 N.J. 504 (2018), the plaintiffs alleged that their contracts with several furniture companies did not inform them of their right to a refund for untimely deliveries, as required by "clearly established" New Jersey

---

[20] Other circuits are in accord. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) ("[c]ommon questions of fact *cannot* predominate . . . [w]hen a case turns on individualized proof of injury" (emphasis added)); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008) (where the "acceptable measure of injury . . . would require individualized proof, class-wide issues cannot be said to predominate"); *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir. 2001) (case "not suitable for class action treatment because of the variance in injury among the members of the class and the cost of the individualized hearings that would in consequence be required"); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 190 (3d Cir. 2001) (no predominance when injury "cannot be presumed").

regulations, but did not allege any harm to them. 232 N.J. at 510-13.

The New Jersey Supreme Court held that "a consumer who receives a contract that includes language prohibited by [law], but who suffers no monetary or other harm as a result of that noncompliance, is not an 'aggrieved consumer' entitled to a remedy." *Id.* at 509. Like *Rosenbach*, the court concluded that any other interpretation would make "the term 'aggrieved' . . . superfluous." *Id.* at 522. The court provided examples of injuries that would render a consumer aggrieved: "If, for example, a furniture seller fails to timely deliver a consumer's furniture, and the consumer would have sought a refund had he or she not been deterred by the . . . language prohibited by [New Jersey law], that consumer may be an 'aggrieved consumer.'" *Id.* at 523. Or "[i]f an untimely delivery and misleading . . . language leaves a consumer without furniture needed for a family gathering, [he] may be an 'aggrieved consumer.'" *Id.* at 523-24. BIPA's "aggrieved" requirement will give rise to similar variations.[21]

---

[21] Although the district court declined to follow *Rosenbach* (ER8-10), it additionally found it distinguishable because the plaintiffs here supposedly alleged an "injury to a privacy right." ER9. That is insufficient under *Rosenbach*. 2017 IL App (2d) 170317, ¶ 20. And even if an "injury to a privacy right" were enough, the need for *each* class member to *prove* that injury would defeat predominance. *Murray v. Fin. Visions, Inc.*, 2008 WL 4850328, at *5 (D. Ariz. Nov. 7, 2008) ("[I]nvasion of privacy claims require highly individualized determinations of fact and law that

### C. Class Certification Is Improper Because Most Class Members Lack Article III Standing.

If the Court holds, contrary to Facebook's position, that proof of a statutory violation is sufficient on its own to satisfy BIPA's aggrieved requirement, the class cannot be certified for the additional reason that individualized determinations would be required to weed out class members who lack Article III standing. Under Circuit law, "no class may be certified that contains members lacking Article III standing." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."). The need for each class member to make an individualized showing of actual injury—whether under BIPA or Article III—precludes class treatment.

---

make class certification under Rule 23(b)(3) inappropriate."). The district court also stated that "an express request for a fingerprint scan is a far cry from the situation here," where the plaintiffs allegedly were not "on notice that Facebook was collecting their biometric data." ER12. But to the extent a plaintiff's awareness is pertinent to the question of whether he was "aggrieved" by the collection of his data, that factor is *individualized*—it will depend on whether Facebook's conduct was "evident" to a class member, as it was to Mr. Licata. *See* pp. 49-50 *supra*.

## III. A CLASS ACTION IS NOT SUPERIOR TO INDIVIDUAL ACTIONS: THE CLASS-WIDE AGGREGATION OF BIPA'S STATUTORY DAMAGES AWARD WOULD BE CONTRARY TO THE LEGISLATIVE INTENT AND FEDERAL DUE PROCESS.

Plaintiffs had to establish that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The named plaintiffs have admitted that they have not been harmed by Facebook's alleged conduct, and they offer no reason to believe that *any* class member has been harmed. Yet they claim entitlement to *billions* of dollars, contending that there are at least 6 million people in their proposed class and that each should be awarded either $1,000 or $5,000 based on BIPA's statutory damages provision. Dkt. 255 at 6, 17. That theory is beyond the pale: It is impossible to reconcile with Rule 23, the legislative intent of BIPA, and due process.

### A. A Class Cannot Be Certified if it Creates the Potential for a Massive and Disproportionate Statutory Award that Would Be Inconsistent with Legislative Intent.

For over four decades, courts have emphasized that it "is not fairly possible" to conclude that a class action is permissible where it creates the potential for "a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class." *Ratner v. Chem. Bank N.Y. Tr. Co.*, 54 F.R.D. 412, 416 (S.D.N.Y. 1972). As the Second Circuit has explained, the "aggregation in a class action of large numbers of statutory damages

claims potentially distorts the purpose of both statutory damages and class actions," "creat[ing] a potentially enormous aggregate recovery for plaintiffs[] and thus an *in terrorem* effect on defendants." *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 22 (2d Cir. 2003). Although the Supreme Court has not directly ruled on this issue, four Justices have recognized that "[w]hen representative plaintiffs seek statutory damages," the pressure to settle is "heightened" because of the risk of massive liability unmoored to actual injury." *Shady Grove*, 559 U.S. at 445 n.3 (Ginsburg, J., dissenting, joined by Breyer, Kennedy, and Alito, JJ.).[22]

In *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974), this Court held that Rule 23(b)(3)'s superiority prong precluded a class action that sought "outrageous amounts in statutory penalt[ies]." *Id.* at 233-34. The Court explained that when statutory damages awards are aggregated in a class action without any allegation of actual injury, this can result in "staggering" amounts that "would shock the conscience." *Id.* at 234.

In *Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir.

---

22 *See also, e.g.*, *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 280 (4th Cir. 2010) (discussing concerns about "devastating classwide liability for what may be harmless statutory violations."); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 n.5 (11th Cir. 2003) (superiority usually is lacking where "the defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff").

2010), the Court held that *Kline*'s principle applies only where "the potential for enormous liability" "would be inconsistent with [the legislative] intent in enacting the statutory damages provision." *Id.* at 715, 722. This Court has since questioned whether *Bateman*'s limitation of *Kline* remains good law after *Spokeo*. *Bassett*, 883 F.3d at 781 (*Spokeo* "cast aside [this Court's] prior dictum that '[a]llowing consumers to recover statutory damages furthers [FCRA's] purpose by deterring businesses from willfully making consumer financial data available, *even when no actual harm results*'" (quoting *Bateman*, 623 F.3d at 718) (emphasis in *Bassett*)). But at minimum, the Court's decisions in *Kline* and *Bateman* make clear that class treatment is inappropriate when the potential for a gigantic aggregate statutory award conflicts with the legislature's intent.

Due process compels the same result. *See Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016) (disproportionate statutory award "implicate[s] due process concerns"). When statutory damages are aggregated and disassociated from any actual harm, they are "essentially penal," *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919), and due process "of its own force . . . prohibits the States from imposing 'grossly excessive' punishments," *Cooper Indus., Inc. v. Leatherman Tool Grp.*, 532 U.S. 424, 434 (2001). A statutory award is unconstitutional

when it "is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis*, 251 U.S. at 66-67; *see also Stillmock*, 385 F. App'x at 278 (Wilkinson, J., concurring) ("Certifying a class that would impose annihilative damages where there has been no actual harm . . . could raise serious constitutional concerns.").

### B. The General Assembly Did Not Intend to Permit an Enormous Class-Wide Award in this Situation.

The imposition of billion-dollar liability in this case would be wholly inconsistent with the General Assembly's findings and the text of BIPA.

***Legislative findings***. The General Assembly sought to *facilitate* the "growing" "use of biometrics" in Illinois because these technologies "promise streamlined financial transactions and security screenings." 740 ILCS 14/5(a). It wanted to *encourage* people to "partak[e] in biometric identifier-facilitated transactions" by erecting safeguards that would restore the public's confidence. *Id.* 14/5(e). *See also Sekura*, 2018 IL App (1st) 180175, ¶ 58 ("Putting [BIPA's] regulations in place would *further* the selection by '[m]ajor national corporations' of 'the City of Chicago and other locations in this State as pilot testing sites for new applications of biometric-facilitated financial transactions." (emphasis added) (quoting 740 ILCS 14/5(b)); *Vigil*, 235 F. Supp. 3d at 504 ("the Illinois legislature was concerned that the failure of businesses to implement reasonable

safeguards for [biometric] data would deter Illinois citizens from 'partaking in biometric-facilitated transactions' in the first place, and would thus discourage the proliferation of such transactions as a form of engaging in commerce"). The General Assembly did not seek to *eliminate* the use of biometric technologies or to deter their *development*; it wanted regulations that would balance the benefits against the risks. That balance would be destroyed if plaintiffs could obtain multi-billion-dollar class-wide awards without any showing of harm.

***Statutory text.*** In light of BIPA's limited purpose, the General Assembly cabined its provisions in multiple respects. First, BIPA regulates only a specified set of biometric technologies, and expressly excludes numerous others, including those that collect "information derived from" "photographs." 740 ILCS 14/10.[23] Second, the legislature limited the private right of action to "person[s] aggrieved by a violation of this Act." *Id.* 14/20. Third, *damages* are available only for negligent, reckless, or intentional violations. *Id.* 14/20(1)-(2). And fourth, *liquidated* damages are recoverable only when someone proves "actual damages":

---

[23] Notably, one proposed version of BIPA defined "biometric identifiers" to include "*records* or scans of . . . *facial recognition*." Am. to Senate Bill 2400 § 10 (Apr. 11, 2008) (emphases added). This proposal was rejected: Technologies like Facebook's have nothing to do with the financial transactions and security screenings that the legislature was targeting.

BIPA permits "liquidated damages"—of either $1,000 or $5,000, depending on the willfulness of the violation—"or actual damages, whichever is greater." *Id.* 14/20(1)-(2). Although the *Sekura* court rejected this proposition (at ¶ 51), other courts—including the U.S. Supreme Court—have held that such a provision applies only when the plaintiff can prove that he *suffered* actual damages but cannot prove their full amount.[24]

The bottom line is that nothing in BIPA suggests that the legislature intended to permit no-injury class actions seeking billions of dollars against social-networking services that apply facial-recognition technology to online photos. BIPA's carefully tailored structure and express limitations would be hollow if that were the case.

### C. The District Court's Reasoning Was Erroneous.

The district court recognized that "statutory damages could amount to billions of dollars," and that "class certification may be inappropriate where it would result in damages inconsistent with the legislative intent."

---

24 *See, e.g.*, *Doe v. Chao*, 540 U.S. 614, 619-21 (2004) (actual damages required where statute permitted "actual damages sustained . . . as a result of [a violation], but in no case . . . less than the sum of $1,000"); *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 537-38 (7th Cir. 2012) ("liquidated damages are intended to be an estimate of actual damages, and if [the statutory violation] results in no injury at all . . . , the only possible estimate . . . would be zero" (citation omitted)); *McCollough*, 2016 WL 4077108, at *4. *But see Monroy*, 2017 WL 4099846, at *8-9.

ER15 (citing *Bateman* and *Kline*). But it held that a class action was permissible because the General Assembly did not "clearly" state that it wanted to "foreclose" *all* "class actions." *Id.* The same was true in *Kline*, *Bateman*, *Parker*, and the other cases holding that a class action is improper if an aggregated damages provision creates the potential for huge awards that are inconsistent with legislative intent. The fact that the General Assembly declined to prohibit *all* class actions has nothing to do with whether it wanted to permit *this* class action—one that seeks a crushing amount of aggregated statutory damages. It did not.

Finally, although the district court recognized that due process places an independent constraint on statutory damages, it dismissed this problem based on its "discretion to reduce a liquidated damages award to comport with due process at a later stage of the proceedings." ER15. That does *not* solve the problem, because of the unfair settlement pressure occasioned by a "risk of massive liability unmoored to actual injury." *Shady Grove*, 559 U.S. at 445 n.3 (Ginsburg, J., dissenting).

## CONCLUSION

The decision below threatens to stifle the development of biometric technologies in Illinois and elsewhere—the opposite of what the legislature intended. The Court should vacate that decision. It should hold that

plaintiffs lack Article III standing and direct that the action be dismissed for lack of jurisdiction. Alternatively, the Court should hold that a class cannot be certified under Rule 23.

Respectfully submitted,

*/s/ Lauren R. Goldman*

Lauren R. Goldman
Andrew J. Pincus
Michael Rayfield
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
lrgoldman@mayerbrown.com
apincus@mayerbrown.com
mrayfield@mayerbrown.com

*Counsel for Defendant-Appellant*

Dated: October 9, 2018

## STATEMENT OF RELATED CASES

The district court deemed the following case related to this one: *Gullen v. Facebook*, No. 3:16-cv-00937-JD. That case is now on appeal in this Court. *Gullen v. Facebook*, No. 18-15785.

/s/ Lauren R. Goldman

## Form 8. Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number 18-15982

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1. The brief is ______ words or ______ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,904 words or ______ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b). The brief is ______ words or ______ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated ______. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is ______ words or ______ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is ______ words or ______ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is ______ words or ______ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4. The brief is ______ words or ______ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant: s/ Lauren R. Goldman

Date: October 9, 2018

("s/" plus typed name is acceptable for electronically-filed documents)